This is a case that deals with an attempt by the employer ConAgra to expand the fourth of people that are categorized by them as management, and the plaintiff's regard should be hourly. The plaintiff's brief, the appellant's brief, is divided into four portions that pretty much track the trial court's decision from the Eastern District of Arkansas. So I'm going to deal with them in the order in which they're presented. The first one deals with the discharge or retention of probationary employees. There are 13 pages of the brief committed to this, and in that I've highlighted 17 different occasions where there is an open question as to whether or not a fact is totally disposed of. In other words, a material fact, and there's evidence on both sides of the question. The trial court should have recognized that and referred this matter for trial, not given the relief she did. I think where the trial court might have been misled is in the application of Madden, because Madden appears on the surface to stand for the notion that just one recommendation on one employee is enough to trigger classification as management. But Madden is really quite irrelevant here. It was a decision after a trial level, upon a trial, in which it said that when a jury makes that decision, the jury's evidence is satisfactory and we will take it at face value. But we're not after a trial. We're here to determine if there are facts for trial. And so its applicability, it just, there is none for this occasion. And Bacon, another case What would be the factual issue if there were a personnel decision in which the manager gave particular weight to the suggestion or recommendation of your client? What would be the factual issue in dispute? Well, whether or not that's the only one that was identified, and that's one of the problems here. There's one, perhaps two. No, suppose there were only one as there was apparently in the Madden case. What would be the factual issue then in dispute for a jury? Well, whether or not that was a part of, whether or not the numerosity is there. It can't be occasional, according to the Bacon case. Occasional suggestions, even if they're taken, are not enough. That has to be a routine part of the employer's suggestions that are made by the class members. Well, if that were true, how could the evidence have been sufficient in Madden? Because it's a jury trial. No, but you still have to have sufficient evidence. I thought you were just saying it has to be routine and one is not enough. I have no argument. If the jury decides that it's a part of a, that the structure of making recommendations was in place for that employer vis-a-vis the plaintiff group, then I don't have any way without knowing more about the facts of Bacon and know whether or not that was an appropriate thing for them to do. But it certainly isn't guidance here because we're trying to determine if there are facts to be decided. Okay, now, I think the other flaw in this portion of it, and it reappears again, is that the appellant... May I just ask you one more legal question for you? Do you agree that of the four areas that you break out in your brief, it's sufficient if the employer shows that in one of the four your client was providing recommendations that were given particular weight, that would be sufficient to meet the exception? No, I would say it would be insufficient because it has to be done more than occasionally. Bacon stands for the proposition that occasional suggestions are not enough. But that's a fact question as to whether or not, what's occasional, that's a fact question. It seems like those areas that are broken out, the discharge and retention of probationary employees, et cetera, those are the four areas that we're talking about. Those aren't coming from the Department of Labor recommendations. Those are not coming from Bacon, and they're not coming from Madden. Those seem to be how the parties have decided to argue the facts in this case. I would agree with that analysis. And so I guess my question then relates to Judge Colleton, that as long as we show in one of these four areas that the lawyers have created that it's something more than occasional, then that would have met the burden. Is that fair? I'm sorry. I don't think I'm following you. Okay. I probably poorly asked. The lawyers have created four different factual areas to argue. It's conceded. And those aren't from the Department of Labor recommendations from Bacon or Madden. And so it seems to me that we have to, the law and the Department of Labor says more than occasional. So any one of these four artificially created areas, as long as it's more than occasional, I believe that's correct. Yeah. That would pass the statutory test. Okay. Thank you. Yeah. The other thing I wanted to bring to your attention is that 29 CFR 541.105 requires an actual recommendation. And it's clear from the record, and the appellee argues, that the management's position was that in this period of retention or probation, if a group leader did not, a plaintiff, did not speak up, then that silence was to be construed as a recommendation to keep that employee. And I think that's just a totally absurd understanding of what a recommendation is. A recommendation... Why is that absurd if everybody had the understanding that silence, that wouldn't be absurd, would it? Well, that's a disputed matter. Many of the plaintiffs say they had no idea that they were charged with that responsibility during that period at all. Well, that's a different point than whether it's absurd to say that silence can be a recommendation. Well, yeah. I guess you're right. In the factual background of which I see this operating, it's absurd. Because there were no instructions to that effect. Not in the record, and it's the defendant's burden of proof to show that there were. But it makes the word meaningless. I mean, a recommendation, anywhere you look it up, contains a suggestion for a change and some kind of moral imperative, like you should do this or you ought to do that or you better not do that. Those elements are absent in what the plaintiffs testified was their duty in dealing with discipline or, in this case, in dealing with the discharge or retention of probationary employees. They just gave facts. They gave John was absent for the 17th time this quarter. That's a fact. To read that as a recommendation without, as Judge Colton said, some warning ahead of time that your failure to speak up is going to be deemed a recommendation, I think is disapposititious. Well, didn't several of the clients suspend hourly workers as part of a disciplinary process? Well, the disciplinary process might have, but my folks only suspended when their superiors from HR directed them to do that. That's their testimony. And the judge just wrote over it. But did your clients initiate the inquiries by reporting matters? Well, they would report that there was, sure, sure. That's their duty. They're the people on the floor. They're the ones that have contact with the facts. But to conflate facts and recommendation, fact reporting and recommendation, just isn't the way it was done here. That's the plaintiff's view. In this instance, you're talking about probationary employees. Yeah, that's right. That's right. And so these are people who have already been retained, but theoretically the company wants to see them retained. And in the management, or in your case, the plaintiffs, would say, nope, that's not a good guy. That's kind of how that process works. Well, it was supposed to. I think in theory they would speak up. But a lot of them, as I said, had no idea that they were even being looked to. In fact, one quoted HR as saying, we'll talk with the employees. But there was at least two instances on the probationary employees where they would give negative recommendations. Well, one was hotly contested. Mr. Emory said, I didn't give any recommendations at all. So you're really down to one. So I think you have a problem with the numerosity side of it. Is there a place in the factual record where it's clear that the team leader made a recommendation and it wasn't followed? Well, yes. Which one? I'm sorry, I can't come up with mine, but there were two people in particular, Orndorff and Garrison, I believe, that said that they made recommendations and they were ignored. See, they were ignored. Nothing happened as a result of it. Well, now you've said that your people were making recommendations. Well, this is not in promotion and demotion. This is in discipline, in the disciplinary thing, which I obviously don't have time to get to. Well, you have five minutes if you want to get to it. Now, when you talk about discipline, you're referring to permanent employees there, not just probationary, right? I'm going to have to pass to preserve my rebuttal time. Very well. Thank you, gentlemen. All right. Mr. Weissler, we'll hear from you. Thank you, Judge Carlton. It may please the Court. My name is... You may adjust that podium. There's a button on the side there. I think I'm a little taller than the podium will go, unfortunately. I see. You're up to the top. Okay. Well, very well. Thank you. My name is A.J. Weissler, and I, along with my colleague at Council Table, Joe Glinius, represent ConAgra Foods, the appellee and cross-appellant. And before I dive into responding to the merits of the arguments on the initial appeal, the summary judgment grant, I do want to address that there is a cross-appeal on the purely legal question of whether or not costs are available to a prevailing defendant. I plan to focus, and with the Court's permission, will stick to the arguments related to the underlying summary judgment grant. I believe that the Marks case addresses fairly simply the issue of whether costs are available to prevailing defendants. But, of course, I'm happy to answer any questions that you might have. I think what we heard during the argument here and what was elicited by the questions from Your Honors is a simple fact that plaintiffs are attempting to run away from the facts of their case, the facts that were developed through the depositions of those plaintiffs and their testimony. And the way that they're trying to do that is by coming up with, I'll call it a novel label, for what they were doing as mere fact reporters or mere observers of behaviors without providing any sort of recommendation. And, Judge Carlton, you made the excellent point that towards the end of the plaintiff's argument, there was a clear moment where they started to say, well, some recommendations were made but not followed. And the record is full of sort of that tension where plaintiffs try to pass themselves first as mere neutral reporters of fact but then also as folks whose recommendations weren't followed. An important thing to remember as well, and it was again addressed by Judge Carlton, that these situations, these four categories that the Court used below, the four that have come up in the briefing, any one of those four categories is sufficient to satisfy the fourth prong of this exemption. The Department of Labor directs us there. There's certainly no requirement otherwise. And this Court's decision in Madden dictates that as well. In that case, there was only evidence of involvement in hiring. No other changes of status were involved. And there's only evidence of hiring in one change of status, one hiring decision. And that was sufficient. Well, could you, on this fact reporter versus recommender question, do you agree that it's conceivable that an employee could be a fact reporter without meeting the fourth prong? Conceivable in another case perhaps. If the employer said, we need you to give us facts about such and such every so often, then we'll decide what to do with it. Those facts exist here. So we have in this environment what are called line leads. These are hourly employees who work for the team leaders. And there are situations where those employees would raise issues, concerns about behavior, et cetera. And the team leaders themselves would investigate, corroborate, and then elevate if they needed to. And it's that second part that's really important here. Because these were not neutral reporters of facts who had a list of rules, and as soon as somebody violated it, they raised their hand and said, this person just violated the rules. These employees knew how or had the responsibility to coach their employees, train them, try to improve their performance through nondisciplinary steps. And then they only elevated conduct up to the management and HR level when they, the team leaders, determined that it was something that deserved discipline. I agree that in a situation where they said, here are five things. If anyone does these five things, tell us. But it was more broad than that, and they had much more discretion. In fact, Toni Orndorff, who's the plaintiff that they rely on the most, had a situation in her deposition where she described an employee, Carrie Haley, somebody who she ultimately disqualified from her position, and they were discussing progressive discipline for Ms. Haley. And the discipline form that they were looking at was a second step discipline in the progressive disciplinary policy, a written warning. And in it, there were listed three violations, and the question was asked, is this final written warning for these three different things? Ms. Orndorff's answer, poor Carrie, yes, because she would have received a lot more. Question, it sounds like Carrie had a lot of issues. Answer, well, I was having a lot of issues with her, but she had problems, and I wanted to give her the opportunity to try to find something else. Question, did you coach her first? Ms. Orndorff's answer, yes. Question, then, and you can correct me if I'm wrong, but I think what you're saying is that each of these incidents individually could have been part of the progressive disciplinary process. Answer, yes. Question, you could have given her an oral warning, final warning, and a suspension and fired her. Yes. Question, but you decided that you'd rather give her some time to either improve her performance or find another job because this one wasn't working out. Answer, correct. Shows up in Appendix 1429. Ms. Orndorff's testimony here makes it clear that she understood her role to not just report violations but instead to manage discipline for her employees, a situation where if she wanted to, she could have represented or issued three different steps of discipline. And later in her testimony, she acknowledged that her manager agreed with this plan, and Ms. Haley was only issued the final written warning. It's also important to remember all of these disciplinary decisions are occurring in a very controlled environment with a collective bargaining agreement that dictates the progressive disciplinary steps. So the suggestion that there are neutral reporters, in fact, who don't make recommendations for what discipline is really to say that there are neutral reporters, in fact, who are unable to know at any moment what level of discipline any individual is on. There's no difference in this situation than raising your hand and saying that person should be disciplined and I recommend the next step than there is to just say that person needs to be disciplined. And, again, the testimony and the evidence is generally clear. Every one of those people testified that they knew they would only issue discipline or raise discipline when it went up, and in their depositions, they made it clear that that recommendation, that discipline issued all of the time or virtually all of the time. As you asked, is there any example in the record of a specific recommendation that wasn't followed? There isn't. There's none. Not anywhere in the record is there a name where they said, I wanted to discipline somebody and somebody told me no. Getting back to the probationary employee question, I think the most important thing to remember there is I'm not convinced that Marks totally controls this. Stop me at any point here, but I understand Marks arose within the context of the Fair Debt Collections Practices Act. That's right. And unlike the FLSA, which did specifically bring up something about costs, the Fair Debt Collections Practices Act brought up nothing about costs. And so that was all silence. Is that fair? I would respectfully disagree. The Fair Debt Collections Practices Act actually has two provisions that talk about costs. They have the same provision that's in the FLSA, which awards attorney's fees and costs to a prevailing plaintiff, which is, again, what the FLSA Section 216b says. But the FDCPA also has a provision that says that a defendant is entitled to both attorney's fees and costs if they can show that it was litigated in bad faith. So the silence there was on the narrow issue of whether or not a prevailing defendant who could not show bad faith would be entitled to costs. Here, the silence covers everything that would happen with a prevailing defendant. The FLSA does not say anything about that. So the silence that Marks was focusing on that left open the possibility that Rule 54D's default would come into play is actually broader in the FLSA than it is in the FDCPA. And the FLSA specifically talks about the plaintiff. That's right. Totally silent on the defendant. Totally silent on the defendant. And are we not to presume that Congress knows what it's doing, then, in light of seeing the Fair Debt Collection's practices at states for certain things? Don't we also presume that they had thoughtfully considered defendant if they considered plaintiff? I think what we have to assume is that Congress knew the default rules in which they were legislating. And that default rule is Rule 54's explanation that unless a statute expressly is contrary to Rule 54, then Rule 54's default presumption of an entitlement to costs exists. In fact, we actually see the Congress at the time, and we laid this out in the brief, enacted other laws and other versions of this law that explicitly said costs won't be available in certain circumstances. And under Marks, that's what's required. Some limit on the court's discretion to award costs to a prevailing defendant. There's nothing in the FLSA that does that other than silence and the implication from it. And Marks rejects the idea that silence and some sort of implication would do that. And Judge Weber-Wright's opinion had the alternative findings. That's right. So she basically acknowledged that this was an open question in this circuit on whether or not costs were available to a Fair Labor Standards Act prevailing defendant. And the plaintiff didn't raise any alternative arguments to that. She didn't address any of them. So she was deciding it based purely on that question of law and basically kicked it up here and said, you know, if the Eighth Circuit says that this is what it is, then here's the amount that they should order be awarded to defendants. That's right. Now you wanted to go back to probationary employees. I did. Do you want to speak to this question whether silence is a recommendation? So I think that the short answer is it's not just silence. It's silence with an obligation to speak up if there's a problem. And it's silence with an obligation to speak up with a problem within a certain period of time. Where does the obligation come from? The obligation comes from their admitted understanding of their job duties, the unrebutted testimony of the upper-level managers in HR who said that we understood that they were the only person to do it. To use their testimony, you know, this is Plaintiff Emery testifying in his deposition. The question, was it your understanding that if you were going to recommend that someone not be retained after their probationary period, then you would have to go to your manager or someone else to let them know that that person wasn't performing? Answer, correct. And that's at Appendix 739 to 740. Plaintiff George testified at length about his understanding. The question, if you had an issue with a probationary employee as a team leader, would it have been sort of your duty to go to your manager or HR and say, this person is probationary and they're terrible? Answer, yes. That's at Appendix 1014 to 1015. And the other important thing with these probationary employees is to understand that it wasn't always silence. You know, they've tried to cast our argument as that, and it certainly was understood that with the obligation to say something before the probationary period ended, silence was a recommendation. Actually, that's not entirely true. Silence was a final decision. There was nobody backstopping these people. Nobody else was coming to the line to evaluate their performance. Nobody else was making a decision other than the team leaders. How about where Emery says, once I became convinced that making a recommendation was a waste of time, I quit making recommendations? So the issue there is that that came up in his declaration, which was submitted in support or either opposition to the summary judgment motion. And during his deposition, he was asked the very explicit question of whether or not you went to the manager. And he came up with the answer of, I might have, but I don't remember. And then in his declaration after his testimony, now he's coming up with these specific examples and no explanation for why that hadn't come to him or why he hadn't remembered that during his deposition when he was previously under oath. No, no, the part I was quoting was from, you don't think that's from his deposition? Well, so the part from his deposition that I'm familiar with is when he was asked, after the quote that I gave you earlier, about whether he ever went to his manager and told them, I think this person is not performing. And his answer was, there may have been one or two, but I really can't recall the aspects of that. And then the question was, so it's possibly recommended someone not be retained, but you just don't recall the specifics. And his answer is, it's possible. And then the record evidence demonstrates that it's not only possible, but that it happened with an employee, Maria Solis. I believe the testimony, and I apologize if I'm wrong, but I believe the testimony that you were reciting to was actually from his declaration, this idea that there was a period of time where they did it, and then they stopped. Is there any legal significance, if we're talking about the promotion aspect, that the manager would tell these plaintiffs to take personal action that they didn't agree with? The only significance there is that it falls into the general factors that you should consider, how often suggestions are being made, and how often they're followed, and whether it was their job duty. I hear that the plaintiffs were being told what to do by a higher-level manager. Is that fair? I would say they were being told what to do after they had raised the issues themselves and after they had initiated the process about what to do. The testimony that I think you're describing is Plaintiff Garrison, who during her deposition when talking about qualification and disqualification said that there were a handful of times where she would have an employee in front of her where she thought they needed a little more time, and her manager would say, no, we need to go ahead and disqualify. So if there was a disagreement there, it was certainly a slight one. And this same Plaintiff Garrison, during her testimony, when asked whether or not the stack of discipline and disqualifications that they had gone through were her recommendations, she acknowledged most of them were. And when asked whether or not they were followed or when she came to somebody with an issue like discipline, whether it stuck, her answer was most of the time. Do you think we need to look at each of these plaintiffs individually? They certainly are bringing individual claims. Yes. So when you cite a couple examples, if a different employee had a different understanding, we couldn't treat them all the same. We'd have to look at each one separately. Well, I think there's several things that will simplify that process for everyone. And the first one is that at the district court level in the Eastern District of Arkansas, there's a local rule that requires us to provide a statement of undisputed facts and it requires the plaintiffs to respond. So to the extent that we are going to look at these plaintiffs individually, they also were at least expected to muster some sort of evidence individually to respond to those facts, and the vast majority of them did not. And that is detailed in our reply to that statement of facts, which was filed in the district court and appears in the Record of Appendix 2056. I apologize for its length, but obviously there's a lot of plaintiffs and a lot of facts that were raised and very, very few facts that were disputed. The other thing that's important is that there are several of these employment decisions that were disputed by none factually. No plaintiff raised any significant concern, or rather any factual dispute, about their role in evaluating qualifying employees, their role in scheduling employees and assigning overtime and assigning temporary reassignments to positions that increased compensation. Those are facts that every plaintiff agreed to. The only attempt to dispute scheduling came from Plaintiff George. Plaintiff George's affidavit just said that, well, there was one central scheduler and also one hourly employee may have done some scheduling. But when you compare that to his deposition testimony, it's flatly contradictory, and therefore there is no dispute as to what plaintiff's role was when it came to scheduling, assigning overtime, temporary assignments. And it's important to know that there are, and as were detailed in our principal brief, specific examples of involvement in significant decisions for each of the plaintiffs. So if we are going to look at them not as a group but on an individual basis, there is evidence that each one of them was involved in decisions that rendered them exempt. If there are no further questions, I appreciate it. Very well. Thank you. Thank you for your argument. Mr. Sanford, we'll hear from you and rebuttal. Yes. Time didn't allow me to develop the rest of the subparts of the brief, but in the discipline process, I would ask you to look carefully at the brief because it establishes that although there were recommendations made sometimes, sometimes they were followed, sometimes they weren't, they were extremely rare, but in only one clear-cut example is there actually a change of status as that term is defined by the Title VII phrase, tangible employment action, that someone actually had different responsibilities and got a reduction in benefits or a reduction in pay. That was virtually never the case on anything that the team members might have initiated. And I just wanted to go over. Well, counsel, the question that I asked was answered a moment ago, and counsel said that there are no examples factually in the record where a recommendation was not followed. Well, just aside from the team members' testimony. Well, I guess that's what I'm asking. Well, I can't provide you with this. Sir, can you identify by name or by factual situation that we could go to the record and verify a situation in which a recommendation of the team leader was not followed? No, sir, not from memory. Sure can't. Anyway, there are six reasons why a jury could differ from the court's decision. Some gave information that could support disqualification, as we just talked about, but nothing happened. There was a tremendously insignificant number of disqualifications. They only identified one, and I think that that was 15 years earlier than when the deposition was being taken. They have no mention in their job description of this responsibility at all, none at all. They're asked to coach, evaluate, but not to do this kind of thing. The plaintiffs were not evaluated at all on their involvement in this skill, even when they had sit-down sessions with their supervisor about whether or not, this is annually, about whether or not they were meeting the terms of their employment agreement and the expectations of them. Then the plaintiff's testimony conflicts on the defendant's as apparent from consequence of reports. There's just, as I identified, 48 conflicts that the judge in some cases ignores, in some cases minimizes, sometimes creates a difference, and then says, well, with that difference, we can't regard their testimony. I just don't think that's the role of the judge to reach those kind of conclusions on a motion for summary judgment. It's just to establish whether or not there are questions that need to be resolved. Then the last one that I mentioned already is that the discipline did not result in any change of status as as defined by the phrase, the tangible employment action from Title VII. Thank you. Thank you very much. The case is submitted, and the court will file an opinion in due course. Thank you to both counsel.